**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 10 B 44276 |
| AMERICAN PATRIOT INSURANCE | ) Chapter 7 |
| AGENCY, INC., *et al.*,[1] | ) Honorable Pamela S. Hollis |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Hearing Date:   November 8, 2011** |
| | ) **Hearing Time:   10:00 a.m.** |
| | ) **Room No:       644** |

**NOTICE OF MOTION**

PLEASE TAKE NOTICE that on **November 8, 2011 at 10:00 a.m.**, or as soon thereafter as counsel may be heard, we shall appear before the Honorable Pamela S. Hollis in the courtroom usually occupied by her, No. 644, in the Dirksen Federal Building at 219 South Dearborn Street, Chicago, Illinois, or whomever may be sitting in her place and stead, and then and there present the **Trustee's Motion to Approve (A) Settlement with Diane M. Hendricks and Related Parties; (B) Confidentiality Agreement; and (C) Retention of Contingent Fee Counsel Pursuant to 11 U.S.C. §§ 327 and 328**, a copy of which is attached hereto and hereby served upon you.

Dated:  October 17, 2011

Respectfully submitted,

BARRY A. CHATZ, not individually, but as Chapter 7 trustee of AMERICAN PATRIOT INSURANCE AGENCY, INC., and Chapter 7 trustee of TEXAS APIA, INC.

By:___ /s/ *Joseph D. Frank*_____
      One of his attorneys

Joseph D. Frank (IL No. 6216085)
Micah R. Krohn (IL No. 6217264)
FRANK/GECKER LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois  60654
Telephone:    (312) 276-1400
Facsimile:    (312) 276-0035
jfrank@fgllp.com; mkrohn@fgllp.com

---

[1] The Debtors in these Chapter 7 cases are: American Patriot Insurance Agency, Inc. and Texas APIA, Inc., Case No. 10-44286.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 10 B 44276 |
| | ) | |
| AMERICAN PATRIOT INSURANCE | ) | Chapter 7 |
| AGENCY, INC., *et al.*,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Honorable Pamela S. Hollis |

**TRUSTEE'S MOTION TO APPROVE (A) SETTLEMENT
WITH DIANE M. HENDRICKS AND RELATED PARTIES;
(B) CONFIDENTIALITY AGREEMENT; AND (C) RETENTION
OF CONTINGENT FEE COUNSEL PURSUANT TO 11 §§ 327 AND 328**

Barry A. Chatz (the "Trustee"), not individually but as the Chapter 7 trustee of the

bankruptcy estates of American Patriot Insurance Agency, Inc. ("APIA") and Texas APIA, Inc.

("Texas APIA," and together with APIA, the "Debtors"), by and through his attorneys,

respectfully requests the entry of an order:

(1)     pursuant to 11 U.S.C. § 363(b) and Rule 9019 of the Federal Rules of

Bankruptcy Procedure, approving (a) the Trustee's Settlement Agreement attached hereto

as **Exhibit A** (the "Settlement Agreement") between the Trustee, on the one hand, and on

the other hand, Diane M. Hendricks ("Hendricks"), Hendricks Holding Company, Inc.

("Holding"), Diane M. Hendricks Enterprises, Inc. ("Enterprises", and collectively with

Hendricks and Holding, the "Insiders"), and the following additional parties (collectively,

the "Additional Parties"): WRI Management Services, LLC ("WRI"); American

Westbrook Insurance Services, LLC ("American Westbrook"); Insential, Inc.

("Insential"); Leo & Brooks, LLC, n/k/a Leo Law, LLC; Karl Leo ("Leo"); Don Urbanciz

("Urbanciz"); Meckler, Bulger, Tilson, Marick & Pearson LLP ("Meckler"); Mello Jones

& Martin; Cox, Castle & Nicholson LLP; and Orgain, Bell & Tucker, LLP; and (b) the

---

[1] The Debtors in these Chapter 7 cases are: American Patriot Insurance Agency, Inc. and Texas APIA, Inc., Case No. 10-44286.

Trustee's Confidentiality and Nondisclosure Agreement with Enterprises attached hereto as **Exhibit B** (the "NDA"), regarding information to be provided to the Trustee under the Agreement; and

(2)     pursuant to 11 U.S.C. §§ 327 and 328, approving the Contingent Fee Retainer Agreement (the "Meckler Retention Agreement") between the Trustee and Meckler, a copy of which is attached as **Exhibit C** to this motion, which sets forth the proposed terms of retention and payment for legal services to be provided by Meckler under the Settlement Agreement in connection with the prosecution of claims to recover insurance proceeds.

## JURISDICTION

1.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

3.     The relief sought is appropriate and proper pursuant to 11 U.S.C. §§ 105, 328 and 363(b) and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4.     On October 1, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Court").  On November 17, 2010, the Court entered an order directing the joint administration of the Debtors' Chapter 7 cases.  Barry A. Chatz is the duly appointed trustee for each Debtor's bankruptcy estate.

5.      Prior to the Petition Date, APIA was a licensed insurance brokerage agency that marketed commercial insurance products to roofing contractors. The products offered by APIA included workers' compensation, employers' liability, automobile liability and general liability insurance coverage (the "Roofers Program").

6.      Texas APIA is a Texas corporation of which APIA is the sole shareholder.  Texas APIA was formed for the sole purpose of acquiring the assets of another insurance agency, Talon Insurance Agency, Ltd. ("Talon"), through a transaction which never closed.  No timely claims were filed against Texas APIA's bankruptcy estate.

**The Mutual Entities Litigation**

7.      Beginning in 1997, APIA began to insure its Roofers Program through a rent-a-captive program marketed by a family of companies that included Legion Insurance Company and Villanova Insurance Company (together, "Legion"), Mutual Indemnity (Bermuda), Ltd. ("MIB"), Mutual Risk Management, Ltd., Mutual Holdings (Bermuda) Ltd. and Commonwealth Risk Services LP (collectively, the "Mutual Entities").

8.      Generally, Legion issued the insurance policies and paid the claims under the Roofers Program. Legion reinsured a portion of the policy limits with MIB, and APIA agreed to pay MIB for amounts covered by MIB under its reinsurance agreement with Legion.  APIA (and later Hendricks and her husband Kenneth A. Hendricks[2] (the "Hendrickses") posted irrevocable letters of credit (the "LOC's") to secure APIA's obligations to MIB.   A third-party claims company, Cunningham-Lindsey Claims Management, Inc. ("Cunningham-Lindsey"), provided all claims-handling services for the program, including setting reserves.

9.      In late 1999, Legion discovered that Cunningham-Lindsey, among other things, had been under-reserving claims and miscalculating the target loss ratios used to underwrite new

---

[2] Mr. Hendricks subsequently died.

and renewal policies. Subsequently, APIA, the Hendrickses and the Mutual Entities conferred regarding the underfunding of reserves, the resultant potential liability of the various parties and possible remedial measures, including the purchase of reinsurance coverage that the Hendrickses believed would limit their perceived exposure.

10.     The communications among APIA, the Hendrickses and the Mutual Entities, and the related actions taken in response to the underfunding of reserves in the Roofers Program, have been the subject of litigation in multiple jurisdictions, in which APIA and the Hendrickses alleged that the Mutual Entities had engaged in a scheme to defraud them, and in which the Hendrickses sought to enjoin any draw on the LOC's until the fraud claims were resolved.

11.     Ultimately, APIA and the Hendrickses brought their fraud claims against the Mutual Entities in the Supreme Court of Bermuda, Civil Jurisdiction, 2003: No. 26 and 2004: No. 196. On July 9, 2010, the Supreme Court of Bermuda (the "Bermuda Court") entered judgment against APIA and the Hendrickses and in favor of the Mutual Entities (the "Bermuda Judgment"). Thereafter, Hendricks timely appealed the Bermuda Judgment to the Court of Appeal for Bermuda. On August 5, 2011, the Court of Appeal for Bermuda entered an order reversing the Bermuda Judgment and entering judgment in favor of Hendricks and against certain of the Mutual Entities (the "Bermuda Appellate Judgment"). Certain of the Mutual Entities have issued an application for permission to appeal the Bermuda Appellate Judgment to Privy Council. The Mutual Entities' application for leave to appeal is set to be heard on November 16, 2011.

### The Cunningham-Lindsey Litigation

12.     In 2005, APIA and its former sole shareholders, the Hendrickses brought a state court lawsuit (the "Cunningham-Lindsey Action") against Cunningham-Lindsey arising out of the claims handling services that Cunningham-Lindsey provided to APIA in connection with the

Roofers Program.  The Cunningham-Lindsey Action is styled as *American Patriot Insurance Agency, Inc. v. Cunningham-Lindsey Claims Management, Inc.,* and is pending as Cause No. 2005-60058-393 in the District Court of Denton County, Texas, 393rd Judicial District.

13.    Cunningham-Lindsey was insured under a Miscellaneous Professional Liability Policy No. 279-53-55 issued by American International Specialty Lines Insurance Company ("American International"), formerly a member company of American International Group and currently a member company of Chartis, Inc. (the "AIG Policy").

14.    Cunningham-Lindsey also was insured under a Comprehensive Crime Insurance, Insurance Companies Professional Liability Insurance, Directors and Officers Liability and Company Reimbursement Insurance, Employment Practices Liability Insurance and Fiduciary Liability Insurance Policy No. 823/FD0000493 issued by Certain Underwriters at Lloyd's, London (including Novae Underwriting, Ltd.) issued to Cunningham-Lindsey's parent company, Fairfax Financial Holdings (the "Lloyd's Policy").

15.    There is an agreement in principal between Cunningham-Lindsey, the Trustee and Hendricks to settle the Cunningham-Lindsey Action, which agreement provides for: (i) the entry of a stipulated judgment in favor of the Trustee and Hendricks, and against Cunningham-Lindsey in the amount of $5,120,000; (ii) the payment of the amount of American International's remaining limits of liability under the AIG Policy, totaling approximately $650,000, to the Trustee and Hendricks (the "AIG Settlement"); and (iii) the assignment to the Trustee and Hendricks of all of Cunningham-Lindsey's rights to payment under the Lloyd's Policy.

**The Legion Claim**

16.    On March 28, 2002, the Pennsylvania Commonwealth Court appointed the Insurance Commissioner of the Commonwealth of Pennsylvania (the "Commissioner") as

statutory rehabilitator for Legion.  On July 25, 2003, the Commonwealth Court entered an order placing Legion into liquidation.

17.       On February 22, 2005, the Commissioner filed a complaint against APIA in the District Court for the Northern District of Illinois, Case No. 05 C 1049, to recover collected and uncollected premiums allegedly owing under policies that Legion had issued in connection with the Roofers Program. On September 28, 2010, the District Court entered partial summary judgment in favor of the Commissioner in the amount of $561,831.76 with respect to certain collected insurance premiums that the District Court ruled that APIA held in trust for the benefit of the Commissioner.

18.       The Commissioner filed a claim against APIA's estate in the minimum amount of $4,502,066.76, a portion of which is claimed to be secured on account of the partial summary judgment entered by the District Court.

**The Saran Claim**

19.       On March 19, 2009, Lysa Saran ("Saran"), APIA's former president, commenced an action against APIA, Hendricks, WRI, Leo and Urbanciz in the Circuit Court of Cook County, Illinois, County Department, Law Division, Case No. 09 L 3352, which, as amended, alleges claims relating to APIA's proposed 2008 acquisition of Talon and Saran's termination as APIA's president on February 13, 2009.

20.       Saran filed two claims against APIA's estate in the approximate aggregate amount of $690,000 plus certain unliquidated amounts.

**The Claims Among the Trustee, the Insiders and the Additional Parties**

21.       Since his appointment as Chapter 7 trustee in each of the Debtor's bankruptcy cases, the Trustee has investigated the Debtors' assets and liabilities, and has identified potential

causes of action against the Insiders and certain of their affiliates and legal representatives, including the Additional Parties (collectively, the "Estate Claims").

22.     The Estate Claims include, among others: (a) claims to avoid as fraudulent transfers distributions that APIA made to Holding and Hendricks, payments that APIA made to several law firms on account of legal services that those firms provided to Hendricks and one or more of her related entities, and transfers that APIA made to Insential and American Westbrook; and (b) claims for breaches of fiduciary duty relating to the aforementioned transfers and the failed Talon acquisition.

23.     Certain of the Insiders filed proofs of claim (the "Insider Claims") against APIA's bankruptcy estate totaling nearly $15 million, including among other claims, a secured claim in the amount of approximately $300,000 filed by Holding as assignee of Blackhawk State Bank, a claim in the amount of $3.5 million filed by Holding for contribution in connection with the settlement of litigation among APIA, Holding and Talon, and a claim in the amount of $9,878,716.00 filed by Hendricks in connection with Hendricks' alleged losses relating to the Roofers Program, including draws under the LOC's and investment bonds totaling $5,354,572 and liability in connection with the Bermuda Judgment in the amount of $4,425,144.

24.     Other than the Insider Claims, the only claims filed against the Debtors' estates are those filed by the Commissioner and Saran (collectively, the "Non-Insider Claims").

**The Proposed Settlement**

25.     In an effort to avoid the risk of liability, to eliminate any further expense as a result of litigation between the Trustee, the Insiders and the Additional Parties (collectively, the "Parties"), and to resolve the issues among the Parties, the Parties have elected to enter into the Settlement Agreement with the belief that the Settlement Agreement is reasonable in light of the

facts known to them, and that the Settlement Agreement is in the best interests of the Parties and the Debtors' estates and their creditors.

26.     The Parties agreed to the terms embodied in the Settlement Agreement after engaging in extensive good faith, arm's-length discussions with respect to the claims and defenses of the Insiders, the Additional Parties, the Trustee, the Debtors and the Debtors' bankruptcy estates.

27.     Generally, under the Agreement:

(a)     The Trustee and Hendricks will share the proceeds of the AIG Settlement 65% (Trustee) and 35% (Hendricks);

(b)     The Trustee and the Insiders will jointly pursue recovery under the Lloyd's Policy;

(c)     In lieu of action by the Trustee, the Insiders will prosecute claim objections to the Non-Insider Claims, pursuant to 11 U.S.C. § 502(a), and resolve such claims either in the bankruptcy court or in litigation that is currently pending in Case No. 05 C 1049 in the District Court for the Northern District of Illinois (commenced by the Commissioner in his capacity as statutory liquidator of Legion), and in Case No. 09 L 3352 in the Circuit Court of Cook County (commenced by Saran). The Insiders will have authority to settle or otherwise resolve the Non-Insider Claims, subject only to Bankruptcy Court approval.

(d)     All Insider Claims will be subordinated to Chapter 7 costs of administration and allowed Non-Insider Claims; and

(e)     The Trustee will forbear from prosecuting the Estate Claims pending the Insiders' good faith performance under the terms of the Agreement.  All of the Trustee's rights to assert the Estate Claims will be preserved, and all statutes of limitations and

repose in connection with such claims will be tolled as of the Petition Date pending payment in full of all allowed Chapter 7 costs of administration and Non-Insider Claims.

28.     Under the Agreement, the Insiders will bear legal fees and related litigation costs (*e.g.*, depositions transcripts, expert witness fees, lawyer travel, and document reproduction) of finalizing the AIG Settlement, pursuing coverage under the Lloyd's Policy and defending the Non-Insider Claims to the extent not covered by insurance.

### Settlement Outcomes Relating to the Prosecution of Claims Under the Lloyds Policy

29.     One of the central features of the Settlement Agreement is the joint prosecution by the Trustee and Holding of claims under the Lloyds Policy.  In the event that those claims are settled by agreement among the Trustee, Holding and Lloyds, the settlement proceeds will be distributed as follows:

(a) First, to the fees, costs and expenses of the Lloyd's Litigation,

(b) Second, to the allowed costs of administration of  the Debtors' bankruptcy estates,

(c) Third, to the payment in full of allowed Non-Insider Claims, and

(d) Fourth, to payment by the Trustee of the Insider Claims.

30.     However, in the event that the Trustee and Holding disagree on whether to accept a prospective settlement with Lloyds, the Settlement Agreement provides for three alternative settlement outcomes.  Under the scenario where a proposed Lloyds settlement is acceptable to the Trustee but unacceptable to Holding: (i) Holding will pay the estate a sum equal to 50% of the net amount of the Lloyd's settlement offer (*i.e.*, net of the amount of fees and expenses incurred in connection with the Lloyds Litigation as of the date of the prospective settlement); (ii) the Trustee will waive the Estate Claims; (iii) the Insider Claims will be subordinated to allowed Non-Insider Claims; and (iv) in their sole discretion, the Insiders will pursue the Lloyd's Litigation for their own benefit.

31.     Under the scenario where a proposed Lloyds settlement is acceptable to Holding

but unacceptable to the Trustee, and the prospective settlement would be sufficient to pay Chapter 7 costs of administration and allowed Non-Insider Claims in full: (i) the Trustee will waive the Estate Claims; (ii) the Insider Claims will be allowed in the amount of $3,983,504.00 and paid *pro rata* with allowed Non-Insider Claims; and (iii) in his sole discretion, the Trustee will pursue the Lloyd's Litigation for the benefit of APIA's estate.

32.    Under the scenario where a proposed Lloyds settlement is acceptable to Holding but unacceptable to the Trustee, and the prospective settlement would not be sufficient to pay Chapter 7 costs of administration and allowed Non-Insider Claims in full: (i) the estate will unilaterally pursue the Lloyd's Litigation and the Insiders shall have no further claim to the proceeds of the Lloyd's Litigation except through the estate; (ii) the Trustee will be permitted immediately to pursue the Estate Claims; and (iii) any judgment that the Trustee obtains in connection with the Estate Claims will be reduced by 50% of the net amount of the rejected Lloyd's settlement offer (*i.e.*, net of the amount of fees and expenses incurred in connection with the Lloyds Litigation as of the date of the prospective settlement).

**The Confidentiality and Nondisclosure Agreement**

33.    In addition, under the Agreement, Enterprises will guaranty payment of any judgment or settlement that the Trustee obtains against any of the Insiders in the event that the Trustee pursues the Estate Claims (the "Guaranty").  Enterprises has represented to the Trustee that Enterprises has a net worth of more than $100 million, and has agreed that, in the event that Enterprises' net worth decreases to less than $50 million, Enterprises will grant the Trustee a first security interest in unencumbered property of Enterprises worth at least $10 Million to secure the Guaranty.

34.    In connection with Enterprises' agreement to collateralize the Guaranty if required under the terms of the Settlement Agreement, the Insiders have agreed to provide the

Trustee with the opportunity to review the annual audited financial statements for Enterprises, subject to the approval of the NDA.

### The Meckler Retention

35.     Subject to the Court's approval of the Settlement Agreement and the Meckler Retention Agreement, Meckler will represent the Insiders and the Trustee in finalizing the AIG Settlement, all fees and expenses to be borne by the Insiders, and in the Lloyd's litigation on a contingency basis.

36.     The Debtors' estates lack any funds with which to pursue any recovery under the AIG Policy and the Lloyds Policy (together, the "Policies"), which the Trustee believes represent a significant opportunity for the Debtors' creditors to receive a distribution in the Debtors' bankruptcy case.   Therefore, to assist the Trustee in efficiently pursuing recoveries under the Policies, the Trustee is in need of special counsel that will undertake such an engagement on a contingency basis.

37.     The Trustee seeks to retain Meckler because of the firm's extensive experience and knowledge regarding insurance coverage litigation in general, and regarding the facts and issues underlying these specific matters. Significantly, Meckler has represented APIA and Hendricks in matters arising from the underfunding of the Roofers Program for nearly a decade.

38.     To assure that Meckler is fairly compensated in the absence of readily available estate funds to pay its fees, the Insiders have agreed to pay Meckler's fees and expenses arising from work related to the AIG Settlement.   In addition, the Trustee has requested that Meckler represent him in the Lloyds litigation under a contingency fee arrangement set forth in the Meckler Retention Agreement, attached hereto and incorporated into this motion as **Exhibit C**.

39.     Pursuant to the Meckler Retention Agreement, subject to the Court's approval, Meckler will be paid a contingency fee for services provided in the Lloyds litigation totaling: (a)

20% of the gross amount obtained by Meckler prior to the commencement of discovery, (b)

33⅓% of the gross amount obtained by Meckler after the commencement of discovery, and prior

to any appeal of a final judgment, and (c) 40% of the gross judgment amount recovered after an

appeal of a final judgment.

40.     Holding will advance all litigation costs associated with the Lloyds litigation as

they are incurred, to be reimbursed from any recovery in the matter.  Meckler's percentage

recovery will be based upon the total amount recovered less any amounts reimbursed to Holding.

41.     Meckler did not receive a retainer, and will file a fee application at the appropriate

time, seeking payment of the fees to be awarded under the Meckler Retention Agreement.

42.     As set forth in the affidavit of Steven D. Pearson, attached hereto and

incorporated into this motion as **Exhibit D** (the "Affidavit"), other than as set forth herein and in

the Affidavit, to the best of Mr. Pearson's knowledge, neither Mr. Pearson nor any of the

principals or employees of Meckler represent or hold any interest adverse to the Trustee or the

Debtors' estates or otherwise have any connection with the Debtors, the Debtors' creditors, or

any other party in interest in these bankruptcy cases or their respective attorneys and

accountants.

43.     The Trustee believes that he has claims against Meckler, pursuant to 11 U.S.C. §

548 and the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq*., for avoidance as

fraudulent transfers of payments that APIA made to Meckler during the four years preceding

these bankruptcy cases on account of legal services that Meckler performed for Hendricks and

one or more of her affiliated non-debtor companies.

44.     Under the Settlement Agreement, the Trustee will preserve his claims against

Meckler pending payment in full of all allowed Chapter 7 costs of administration and all allowed

Non-Insider Claims.  The Trustee has agreed to forebear from prosecuting his claims against

Meckler pending the Insiders' good faith performance under the terms of the Settlement Agreement.

45.    In the event that an actual conflict arises between the Trustee and Meckler, the Trustee will promptly disclose such conflict to the Court and seek to immediately terminate Meckler's retention.

46.    Neither Mr. Pearson nor any of the principals or employees of Meckler have any connection with the United States Trustee or any person employed in the office of the United States Trustee.


## RELIEF SOUGHT

47.    By this Motion, the Trustee requests the entry of an order, (a) pursuant to 11 U.S.C. §§ 105 and 363(b) and Rule 9019 of the Federal Rules of Bankruptcy Procedure, approving the Settlement Agreement and the NDA; and (b) pursuant to 11 U.S.C. §§ 327 and 328, approving the Meckler Retention Agreement.

## BASIS FOR THE RELIEF SOUGHT

### The Settlement Agreement should be approved.

48.    The Settlement Agreement is fair and reasonable and in the best interests of the Debtors' estates and their creditors, and should be approved by the Court.   Pursuant to Bankruptcy Rule 9019(a), after notice and a hearing, the court may approve a settlement or compromise.   Compromises are tools for expediting the administration of the case and reducing administrative costs and are favored in bankruptcy.   *See Fogel v. Zell*, 221 F.3d 955, 960 (7th Cir. 2000).

49.    A bankruptcy judge has discretion whether to approve a settlement agreement.   *In re American Reserve Corp.*, 841 F.2d 159, 162 (7th Cir. 1987).   The Court's discretion hinges

upon whether the settlement is fair and equitable and in the best interest of the estate. *Depoister v. Mary M. Holloway Foundation*, 36 F.3d 582, 586 (7th Cir. 1994) (citations omitted).

50.    In making its determination, the Court must first compare the terms of the settlement with the probable costs and benefits of litigation. *Id., quoting Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (the Court should try to apprise itself "of all facts necessary for an intelligent and objective opinion on the probabilities of ultimate success should the claim be litigated").

51.    The Court should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance is the need to compare the terms of the compromise with the likely rewards of the litigation. *Id.* The Court should also consider the delay involved if the settlement is not approved, "including the possibility that disapproving the settlement will cause wasting of assets." *Amer. Reserve Corp.*, 841 F.2d at 161.

52.    Second, the Court should determine whether the settlement falls within the reasonable range of litigation possibilities. *In re Energy Coop.*, 886 F.2d 921, 929 (7th Cir. 1989). Such inquiry does not, however, require an evidentiary hearing. *Depoister*, 36 F.3d at 586. Moreover, the latter determination is to be weighed in favor of settlement since a challenged settlement fails the test only if it falls below the lowest point in the range of reasonableness. *In re Telesphere Comm., Inc.*, 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (internal citations omitted).

53.    The Settlement Agreement is fair and equitable and in the best interests of the Debtors' creditors, and falls well within the range of litigation possibilities. If approved, the Settlement Agreement will facilitate the resolution of litigation with Cunningham-Lindsey and is

anticipated to provide APIA's estate with a stipulated judgment against Cunningham-Lindsey in the amount of $5,120,000; (ii) cash proceeds from American International's remaining limits of liability under the AIG Policy, totaling approximately $422,000; and (iii) the right to pursue Cunningham-Lindsey's claims under the Lloyd's Policy jointly with Hendricks.

54.    This settlement will provide a substantial benefit to creditors, namely, the Commissioner and Saran.  APIA's estate stands to receive the majority of the insurance proceeds remaining under the AIG Policy, and will be able to pursue claims against the Lloyds Policy and defend against the Non-Insider Claims without expending any estate resources.  Thus, the estate will be funded without having to endure the considerable cost, risk and delay that would ensue were the Trustee required to litigate with Hendricks and her affiliates.

55.    In the absence of the proposed settlement, the cost, risk and delay inherent in continued litigation against the Insiders would be substantial.  Hendricks has proven to be a tenacious litigator.  She has been litigating with the Mutual Entities for nearly a decade, with both Cunningham-Lindsey and the Commissioner for six years and with Saran for two years.  It is very likely that, in the absence of settlement, Hendricks and her affiliates would litigate just as strenuously against the Trustee in connection with any attempt to settle with Cunningham-Lindsey, pursue recovery under the Policies and prosecute claims directly against the Insiders.

56.    Moreover, the risks that would be imposed on the Trustee to mount such litigation in the absence of settlement are all the more daunting in light of the fact that the estate is completely unfunded.  In contrast, Forbes magazine estimates Ms. Hendricks's net worth at $2.2 billion as of March 2011 and ranks her 170 on its list of the 400 richest people in the United States.

57.    The Trustee has not yet brought any of the Estate Claims.  Therefore, it would likely take one to two years to litigate any of those claims to judgment, which, if granted in favor

of the Trustee, would likely be followed by costly appeals.   The result of the litigation would be uncertain, and creditors would have to wait years to receive a final distribution, if at all, in this case.

58.      In addition, the Trustee has articulated sound business reasons to enter into the Agreement under 11 U.S.C. § 363.  *See, e.g., In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991). Specifically, for the same reasons set forth above, in the exercise of his business judgment, the Trustee believes that settling with the Insiders on the basis set forth in the Settlement Agreement is in the best interests of the Debtors' estates and their creditors.

59.      Moreover, in the event that the Insiders do not perform their obligations under the Settlement Agreement in good faith or Holding wants to settle the Lloyds Litigation for an amount that is insufficient to pay costs of administration and allowed Non-Insider Claims in full, all Estate Claims are preserved and may be pursued by the Trustee.

**The Meckler Retention**

60.      Section 328 of the Bankruptcy Code allows the Trustee to retain attorneys to assist him in carrying out his duties under the Bankruptcy Code on "any reasonable terms and conditions of employment, including . . . on a contingent fee basis." 11 U.S.C. § 328(a).   "A court in bankruptcy allows retention on a contingent basis to compensate for the risk of non-payment undertaken by contingent counsel."   *In re Churchfield Management & Investment Corp.*, 98 B.R. 893, 899 (Bankr. N.D. Ill. 1989).

61.      Bankruptcy Courts recognize the value of contingent fee arrangements to bankruptcy estates, especially where estate funds are sparse and the proposed litigation may produce the only realistic chance of a distribution to creditors.  *See, e.g., In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327, 336-37 (Bankr. D. Md. 2000); *Churchfield Management*, 98 B.R. at 899.

62.    In *Merry-Go-Round*, the Chapter 7 trustee sought to employ special litigation counsel to investigate and prosecute complex causes of action against certain of the debtor's professionals, officers, and directors. *Id*. at 331.  Because the debtor's estate had no cash reserves, the Chapter 7 trustee sought the retention of special litigation counsel on a contingent basis as "the only way in which the estate could responsibly afford to bring this action and [the trustee] could fulfill her fiduciary duty to unpaid administrative claimants." *Id*; *see also Churchfield Management*, 98 B.R. at 899 (observing with respect to a Ninth Circuit BAP decision, "without the approved [contingent] fee arrangement it was doubtful that the contingent counsel or any other counsel would have taken the case there, the estate having only limited assets to prosecute litigation"), *citing In re Confections by Sandra, Inc.*, 83 B.R. 729, 730-33 (9th Cir. BAP 1987).

63.    In *Merry-Go-Round*, the bankruptcy court approved a 40% contingency agreement in part based on the Chapter 7 trustee's representation that her counsel would be advancing substantial capital and making a substantial commitment to the prosecution of the litigation. *Id*. at 332-33.

64.    The facts before the Court with respect to this motion are similar to those in *Merry-Go-Round*.  If the Settlement Agreement is approved, and once the agreement with Cunningham-Lindsey is consummated, the Trustee's right to pursue claims under the Lloyds Policy may yield a significant recovery for creditors.  However, because of the shortage of funds, a contingent fee arrangement is the Trustee's only realistic course in pursuing a recovery under the Lloyds Policy.

65.    It is reasonable to expect that the Trustee would be required to incur considerable additional attorneys' fees to see the Lloyds litigation through to completion – fees that the Trustee currently lacks the funds to pay.

66.     The Trustee submits that the contingent fee arrangement set forth in the Meckler Retention Agreement is fair and equitable in light of: (a) Meckler's experience in handling similar matters, (b) Meckler's loss of other professional opportunities because of the need to dedicate available resources to the Lloyds litigation, and (c) the need for Meckler to expend substantial amounts in connection with the Lloyds litigation, including Meckler's overhead and employee salaries.

67.     For the foregoing reasons, the Trustee respectfully submits that approval of the Meckler Retention Agreement is in the best interests of the Debtors' creditors.

WHEREFORE, Barry A. Chatz, not individually, but as Chapter 7 trustee in the bankruptcy cases of American Patriot Insurance Agency, Inc., and Texas APIA, Inc., respectfully requests that the Court enter an order, substantially in the form attached hereto: (a) approving the Trustee's Settlement Agreement attached hereto as Exhibit A; (b) approving the Trustee's Confidentiality and Nondisclosure Agreement with Enterprises attached hereto as Exhibit B; (c) approving the Meckler Retention Agreement attached hereto as Exhibit C; and (d) granting such other and further relief as this Court deems just.

Dated:  October 17, 2011

Respectfully submitted,

BARRY A. CHATZ, not individually, but as Chapter 7 trustee of AMERICAN PATRIOT INSURANCE AGENCY, INC., and Chapter 7 trustee of TEXAS APIA, INC.


By:_____/s/ *Joseph D. Frank*_____
           One of his attorneys

Joseph D. Frank (IL No. 6216085)
Micah R. Krohn (IL No. 6217264)
FRANK/GECKER LLPw
325 North LaSalle Street, Suite 625
Chicago, Illinois  60654
Phone: (312) 276-1400
Fax:    (312) 276-0035

## CERTIFICATE OF SERVICE

I, Joseph D. Frank, an attorney, hereby certify that on **October 17, 2011**, a true and correct copy of the **Trustee's Motion to Approve (A) Settlement with Diane M. Hendricks and Related Parties; (B) Confidentiality Agreement; and (C) Retention of Contingent Fee Counsel Pursuant to 11 U.S.C. §§ 327 and 328** was filed electronically.  Notice of the filing, together with a true and correct copy of the motion, will be automatically served upon all parties who are named on the attached Electronic Mail Notice List by operation of the Court's Electronic Filing System.  In addition, copies were served via First Class United States Mail, postage prepaid, upon the parties listed on the attached Service List.



*/s/ Joseph D. Frank*

# Mailing Information for Case 10-44276

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive e-mail notices for this case.

- Barry A Chatz    bachatz@arnstein.com, bchatz@ecf.epiqsystems.com;jbmedziak@arnstein.com;blsutton@arnstein.com;irsiabc@aol.com
- Rosanne Ciambrone    rciambrone@duanemorris.com
- Joseph Dietz    jdietz@fisherkanaris.com
- Richard M Fogel    rfogel@shawgussis.com
- Joseph D Frank    jfrank@fgllp.com, ccarpenter@fgllp.com;knewman@menterlaw.com;jkleinman@fgllp.com
- John W Guzzardo    jguzzardo@shawgussis.com
- Micah R Krohn    mkrohn@fgllp.com, ccarpenter@fgllp.com;rheiligman@fgllp.com
- Patrick S Layng    USTPRegion11.ES.ECF@usdoj.gov
- Steven B Towbin    stowbin@shawgussis.com
- Daniel A Zazove    docketchi@perkinscoie.com

## SERVICE LIST

*In re American Patriot Insurance Agency, Inc., et al.*
**Case No. 10 B 44276 (jointly administered)**

<table>
<tr>
<td>

Jeffrey Snell
OFFICE OF THE U.S. TRUSTEE
Region 11
219 South Dearborn Street
Room 873
Chicago, Illinois  60604

</td>
<td>

Richard M. Fogel
Steven B. Towbin
SHAW GUSSIS FISHMAN GLANTZ
WOLFSON & TOWBIN LLC
321 North Clark Street, Suite 800
Chicago, Illinois  60654

</td>
</tr>
<tr>
<td>

Charlotte E. Thomas
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, Pennsylvania  19103

</td>
<td>

Joseph Dietz
Eric D. Stubenvoll
FISHER KANARIS
200 South Wacker Drive
Suite 2200
Chicago, Illinois  60606

</td>
</tr>
<tr>
<td>

BLACKHAWK BANK
Attn:  Dale Reeves
400 Broad Street
Beloit, Wisconsin  53511

</td>
<td>

ABC SUPPLY COMPANY, INC.
One ABC Parkway
Beloit, Wisconsin  53511

</td>
</tr>
<tr>
<td>

AMERICAN WESTBROOK INSURANCE SERVICE
Four Westbrook Corporate Center
Suite 500
Westchester, Illinois  60154

</td>
<td>

OPTIS PARTNERS, LLC
Attn: Tim Cunningham
53 West Jackson  Boulevard
Suite 1562
Chicago, Illinois  60604

</td>
</tr>
</table>

COX CASTLE & NICHOLSON LLP
Attn:  Robert Campbell
2049 Century Park East
28th Floor
Los Angeles, California  90067-3284

CT CORPORATION SYSTEM
208 South LaSalle Street
Team 3
Suite 814
Chicago, Illinois  60604

HINSHAW & CULBERTSON, LLP
Attn:  Tom Luetkemeyer
222 North LaSalle Street
Suite 300
Chicago, Illinois  60601

INSENTIAL, INC.
Four Westbrook Corporate Center
Suite 500
Westchester, Illinois  60154

Carla Swain
4 Westbrook Corporate Center
Suite 500
Westchester, Illinois  60154

LEO & BROOKS, LLC
Attn:  Karl Leo
200 Randolph Avenue
Suite 200
Huntsville, Alabama  35801

Long Ridge Office Portfolio LP
c/o ARDEN REALTY
14859 Collections Center Drive
Chicago, Illinois  60693

MECKLER BULGER TILSON MARICK
Attn:  Steve Pearson
123 North Wacker Drive
Suite 1800
Chicago, Illinois  60606

MELLO JONES & MARTIN
Thistle House 4 Burnaby Street
P.O. Box 1564
Hamilton HMFX Bermuda

**AIR MAIL**

Mutual Holdings (Bermuda) Ltd.
Mutual Risk Management Ltd.
44 Church Street
Hamilton HM12 Bermuda

**AIR MAIL**

TEXAS APIA, INC.
Four Westbrook Corporate Center
Suite 500
Westchester, Illinois  60154

WRI MANAGEMENT SERVICES
Four Westbrook Corporate Center
Suite 500
Westchester, Illinois  60154

LAKE FOREST BANK & TRUST
727 North Bank Lane
Lake Forest, Illinois  60045

Juergen Huellen
DOUGLAS SHAW & ASSOCIATES, INC.
490 East Roosevelt Road
Chicago, Illinois  60185

HENDRICKS HOLDING COMPANY, INC.
655 Third Street
Suite 303
Beloit, Wisconsin  53511

Michael Schoch
4 Westbrook Corporate Center
Suite 500
Westchester, Illinois  60154

CLIFTON GUNDERSON, LLP
1301 West 22nd Street
Suite 1100
Oak Brook, Illinois  60523

MECKLER BULGER TILSON MARICK
Attn:  Steve Pearson
123 North Wacker Drive
Suite 1800
Chicago, Illinois  60606

SCOTT BIANCHINI
4 Westbrook Corporate Center
Suite 500
Westchester, Illinois  60154

Donald Urbanciz
655 Third Street
Suite 303
Beloit, Wisconsin  53511

Todd Buehl
655 Third Street
Suite 303
Beloit, Wisconsin  53511

Karl Leo
200 Randolph Avenue
Suite 200
Huntsville, Alabama  35801

ORGAIN BELL & TUCKER LLP
P.O. Box 1751
470 Orleans
4th Floor
Beaumont, Texas  77704

John J. Willenborg
4 Westbrook Corporate Center
Suite 500
Westchester, Illinois  60154